**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ANTONIE ELAS, individually and on behalf of all others similarly situated,<br><br>Plaintiff<br><br>v.<br><br>ZAC PRINCE, FLORI MARQUEZ, AMIT CHEELA, DAVID OLSSON, and SAMIA BAYOU,<br><br>Defendant(s) | Case No. ____________________<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Antonie Elas, ("Elas"), by and through his undersigned attorneys, brings this Class Action against Defendants as alleged in this Complaint (the "Complaint") on his own behalf and on behalf of a class consisting of all persons who invested in BlockFi Interest Accounts ("BIAs") during the Class Period, from March 4, 2019, to and including November 28, 2022 (the "Class"). Defendants are officers and directors of BlockFi, Inc. ("BlockFi") and its affiliates as described herein. BlockFi and its affiliates are presently subject to bankruptcy proceedings filed in November 2022 and are not named as defendants in this case.[1]

**SUMMARY**

1. This is a class action on behalf of a class of investors consisting of all individuals and entities who, during the Class Period, invested in BIAs by transferring U.S. Dollars into a BIA account and were allocated cryptocurrency, or transferred cryptocurrency assets to a BIA account in exchange for interest payments, and who suffered financial injury as a result thereof.

---

[1] To the extent, the conduct of BlockFi and its affiliates are referenced herein, it is solely for the purposes of establishing liability of the BlockFi Individual Defendants.

BlockFi and Defendants unlawfully failed to register BIAs as securities before selling them to individual investors.

2. As detailed herein, BlockFi BIAs have at all times constituted an offer and sale of unregistered securities.

3. Moreover, Defendants made repeated false and misleading statements to promote BIAs, including that BIAs were a secure method of collecting interest. In addition, Defendants and BlockFi omitted and concealed material information concerning the risks associated with BIAs. In particular, Defendants and BlockFi concealed information concerning its rampant acts of self-dealing and conflicts of interest specifically with respect to its being beholden to Cameron and Tyler Winkelvoss (the "Winklevosses") who were substantial corporate investors of BlockFi, owned and controlled BlockFi's major custodian of customer assets, Gemini Trust Company, LLC ("Gemini"), and were the issuer of BlockFi default cryptocurrency to BIA account holders, Gemini Dollar. Defendants are sued in their individual capacities and as control persons of BlockFi. No claims are brought against BlockFi or its affiliates.

4. In addition to the undisclosed risks and conflicts of interest posed by their ties to the Winklevosses, Gemini, and Gemini Dollar, Defendants and BlockFi concealed their leverage and exposure to fraud by FTX Trading, Ltd. ("FTX") and Sam Bankman-Fried's trading firm Alameda Research ("Alameda"). Unbeknownst to Plaintiff and Class members, both BlockFi and its custodian who were holding all of its BIA customer assets, were greatly exposed to the FTX fraud due to loans made and credit extended.

5. When the crypto markets collapsed as a result of the failure of Three Arrows Capital ("3AC") and the downfall and exposure of Sam Bankman-Fried and FTX in 2022, BlockFi's house of cards collapsed.

6. On or about November 16, 2022, BlockFi froze withdrawals and refused to honor redemptions from investors for BIAs, resulting in investors, including Plaintiff losing their entire holdings.

7. John Jay Ray III, who was appointed by the bankruptcy court with the approval of the United States Trustee to oversee the bankruptcy of FTX, testified to the House Committee on Financial Services on December 13, 2022, that what occurred at FTX, was "really just old-fashioned embezzlement."[2]

8. Mr. Ray further testified that FTX and Alameda did not maintain sufficient or adequate records of their business dealings ("my ability to comment on certain matters today will be materially limited by the state of FTX Group's books and records . . . we are, in many respects, starting from near-zero in terms of the corporate infrastructure and record-keeping that one would expect to find in multi-billion dollar international business").[3]

9. On November 17, 2022, Mr. Ray stated in a sworn declaration to the District of Delaware Bankruptcy Court that despite having been involved in the bankruptcies of Enron, Residential Capital, Nortel, and Overseas Shipholding:

> Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.

---

[2] https://www.cnbc.com/2022/12/13/live-updates-ftx-collapse-house-lawmakers-hold-hearing-following-arrest-of-founder-sam-bankman-fried.html#:~:text=John%20J.,really%20just%20old%20fashioned%20embezzlement (last accessed February 24, 2023).

[3] Testimony of John J. Ray III, CEO, FTX Debtors, *House Financial Service Committee* (Dec 13, 2022).

10. In addition, Defendants and BlockFi made numerous misleading statements about the safety, security, and overall financial health of BlockFi and assets being held for the benefit of Plaintiff and Class members.

11. The allegations of this Complaint are based on information that became publicly available only in November 2022 with the bankruptcies of BlockFi and FTX.

**JURISDICTION AND VENUE**

12. This Court has jurisdiction over this controversy pursuant to 15 U.S.C. § 78aa as this action is a claim under the Securities Act of 1933 and Section 27 of the Securities Exchange Act of 1934. The claims arise out of Sections 5, 11, 12, and 15 of the Securities Act of 1933 and Sections 10(b) and 20 of the Securities Exchange Act of 1934. The Court has supplemental jurisdiction over the action under 28 U.S.C. § 1367.

13. Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business[4] here and engaging in activities having an effect in this District.

14. In connection with the acts and conduct alleged in this Complaint, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, courier services, electronic mail ("email"), text messages, WhatsApp, and interstate wire and telephone communications.

**THE PARTIES AND NON-PARTY CORPORATE ENTITIES**

[4] To date the Commonwealth of Massachusetts alone, not including business and individuals in the Commonwealth, has submitted approximately $600,000.00 in claims against BlockFi in the Bankruptcy proceeding.

15. Plaintiff Antonie Elas is a resident of Brockton, Massachusetts. Mr. Elas opened a BlockFi BIA account, operated and controlled by Defendants and BlockFi, from his residence in Massachusetts. On or about February 9, 2021, Elas made an initial ACH transfer from his U.S. bank account of $100 to open his BlockFi BIA account. Elas therefore purchased an unregistered security from BlockFi in the form of a BIA account. As set forth in the attached Certification, he continued to purchase unregistered securities from BlockFi under false pretenses until January 20, 2022 and received interest up until October 31, 2022.

16. Upon opening his account, BlockFi gave Elas an allocation of stablecoin to choose to purchase. The top of the list and default selection was for Gemini Dollar, which at the time was offering an interest rate of 8.6%.[5] Gemini Dollar, which was owned and controlled by BlockFi's Custodian Gemini Trust Company, was BlockFi's stablecoin of choice for allocation in BIAs. Indeed, as set forth in the attached Certification, in total, Elas invested over $439,000 which were allocated to Gemini Dollar. At the time of BlockFi halting withdrawals from BIAs, Mr. Elas' account holdings were valued at $466,454.44.

17. BlockFi, a Delaware corporation, filed for bankruptcy on November 28, 2022 in the Bankruptcy Court for the United States District Court in the District of New Jersey. BlockFi's principal place of business is in Jersey City, New Jersey. BlockFi is not a defendant in this case.

18. BlockFi Lending LLC ("BlockFi Lending") is a Delaware limited liability corporation, formed in 2018, and is a wholly owned subsidiary of BlockFi, and also has its principal place of business in Jersey City, New Jersey. BlockFi Lending filed for bankruptcy on

[5] https://web.archive.org/web/20210205122834/https://blockfi.com/rates/

November 28, 2022, in the Bankruptcy Court for the United States District Court in the District of New Jersey. BlockFi Lending is not a defendant in this case.

19. BlockFi Trading LLC ("BlockFi Trading") is a Delaware limited liability corporation, formed in May 2019, and is a wholly owned subsidiary of BlockFi and has its principal place of business in Jersey City, New Jersey. BlockFi Trading filed for bankruptcy on November 28, 2022 in the Bankruptcy Court for the United States District Court in the District of New Jersey. BlockFi Trading is not a defendant in this case.

20. BlockFi, BlockFi Lending, and BlockFi Trading are together referred to as "the BlockFi Entities."

21. Defendant Zac Prince ("Prince") co-founded BlockFi in October 2017 for the purpose of providing credit services to the cryptocurrency market. Prince was named CEO of BlockFi. Prince was responsible for all public statements published or emanating from BlockFi, including all those referenced in this Complaint. Among them was that BlockFi should be considered by investors and depositors as a "bank" for those in the cryptocurrency market.

22. Defendant Flori Marquez ("Marquez") was a co-founder with Prince of BlockFi and in October 2017 Marquez was named COO of BlockFi. Marquez, along with Prince, was responsible for all public statements published or emanating from BlockFi including all those referenced in this Complaint. Among them was that BlockFi should be considered by investors and depositors as a "bank" for those in the cryptocurrency market.

23. Defendant Amit Cheela ("Cheela") was the BlockFi Chief Financial Officer. Cheela was responsible for overseeing all corporate finance, capital markets, treasury, strategic planning, and corporate development. Cheela was responsible for all public statements about the business of BlockFi within his areas of responsibility.

24. Defendant David Olsson ("Olsson") was Global Head of Institutional Distribution of BlockFi until his resignation in September 2022, as the events described in this Complaint were unfolding and in the days before the fall of BlockFi and its bankruptcy. Olsson was responsible for all public statements about the business of the BlockFi entities within his area of responsibility.

25. Defendant Samia Bayou ("Bayou") was Global Head of Private Client Investors of BlockFi until her resignation in September 2022, as the events described in this Complaint were unfolding and in the days before the fall of BlockFi and its bankruptcy. She was responsible for all public statements about the business of the BlockFi entities within her area of responsibility.

26. Defendants Prince, Marquez, Cheela, Olsson, and Bayou are collectively referred to as "Defendants."

**FACTUAL ALLEGATIONS**

27. BlockFi was founded in 2017 and marketed itself as a "bank" to take deposits and act as an intermediary as if it were a commercial bank regulated by Federal and State law. BlockFi stated that it would provide "credit" to others in the crypto market and, as such, described itself as a bank, indicated it would be prudent with the use of its depositors' money, and have adequate reserves. According to BlockFi, its "mission" was to "redefine banking":

> Founded in 2017 by Zac Prince and Flori Marquez, the company was created with the goal of providing credit services to markets with limited access to simple products like a savings account. BlockFi sets itself apart from other cryptoasset service providers by pairing market-leading rates with institutional-quality benefits. The company is the only independent lender with institutional backing from investors that include Valar Ventures, Galaxy Digital, Fidelity, Akuna Capital, SoFi and Coinbase Ventures. The BlockFi team consists of professionals with a deep bench of expertise across financial services and technology with offices in New York, New

> Jersey, Poland, and Argentina. Additionally, Gemini Trust Company, LLC, a New York trust company regulated by the New York State Department of Financial Services, is BlockFi's primary custodian.[6]

28. On its website: BlockFi told investors: "Earn more from your crypto. With a BlockFi Interest Account (BIA), your cryptocurrency can earn up to 8.6% APY. Interest accrues daily and is paid monthly. There are no hidden fees, no minimum balances, and no reason to wait."[7]

29. From the outset, BlockFi did not conduct its activities as a bank would. It did not have adequate reserves and lent its depositors' money out imprudently and without proper due diligence into the credit worthiness of its creditors or with a credit officer responsible for assuring the continued credit worthiness and safely of the loans made. Indeed, the entirety of its business model depended, without disclosure, upon cryptocurrency always increasing when compared with fiat money, that is money issued by governments and backed by the full faith and credit of the government, a tax collecting entity, and issued by law to be accepted within the borders of that country for all transactions and debts. Yet BlockFi did not secure its debts with adequate collateral.

30. On or about March 4, 2019, BlockFi began to publicize and offer BIAs to the public with acceptance into BIA interest deposits of United States Dollars and/or crypto currency. These BlockFi Interest Accounts offered to pay compound interest, on a month-to-month basis, of 6%-8% at a time when the typical interest rate on a savings or checking account in a bank in the United States was much lower. The interest rate could vary month to month upon

---

6 https://web.archive.org/web/20210429112438/https://www.blockfi.com/mission

7 https://web.archive.org/web/20210429112438/https://www.blockfi.com/crypto-interest-account

notice to depositors by BlockFi. Depositors could withdraw the accounts or part of the accounts at any time and be paid in United States Dollars.

31. On March 20, 2019, BlockFi announced that BIAs experienced significant growth, asserting that BIAs "provide[d] the average crypto investor with the tools to build their wealth" and it "look[ed] forward to giving even more investors a chance to earn a yield on their crypto."

32. On April 1, 2019, BlockFi began to "tier" the interest rates that investors received, initially announcing that "BIA balances of up to and including 25 [Bitcoin] or 500 [Ether] (equivalent to roughly $10,000 and $70,000 respectively) will earn the 6.2% APY interest rate. All balances over that limit will earn a tiered rate of 2% interest."

33. BlockFi promised BIA investors a variable interest rate, determined by BlockFi on a periodic basis, in exchange for the assets loaned by the investors, who could demand that BlockFi return their loaned assets at any time. BlockFi thus borrowed the assets in exchange for a promise to repay with interest. Investors in the BIAs had a reasonable expectation of obtaining a future profit from BlockFi's effort in managing the BIAs based on BlockFi's statements about how it would generate the yield to pay BIA investors interest. Investors also had a reasonable expectation that BlockFi would use the invested assets in BlockFi's lending and principal investing activity and that investors would share profits in the form of interest payments resulting from BlockFi's efforts. BlockFi offered and sold the BIAs to the general public to obtain assets for the general use of its business, namely, to run its lending and investment activities to pay interest to BIA investors and promoted the BIAs as an investment.

34. Upon receiving cash deposits into BIAs, BlockFi would convert those into crypto currency for its lending business. It would also accept crypto currency deposits into BIAs for its lending business.

35. BlockFi represented to its BIA customers, including Plaintiff and the members of the Class, that its transactions were prudent, properly collateralized, and as with any bank, done only after due diligence to assure the credit worthiness of the counterparty, such as FTX and Alameda.

36. BIA customers, including members of the Class, were ensured that their funds were lent out to "trusted institutional and corporate borrowers. To ensure loan performance, BlockFi typically lends crypto on overcollateralized terms."[8]

37. Indeed, BlockFi held out to the public, including its BIA customers, that it took an aggressive stance towards risk management and a "thorough analysis of our counterparties to understand their financial standing and ongoing ability to repay loans."[9] "A critical aspect of credit risk is managing concentration to help ensure we don't take on too much risk to any single borrower."[10]

38. Moreover, to support this risk management philosophy and assuage BIA investors' concerns of the risks associated with their products, BlockFi and Defendants represented on their website that they had "[l]iquidity buffers (a.k.a. funds-on-hand) help to ensure we have sufficient liquidity to support client withdrawal requests, even under periods of elevated withdrawal demand."[11] BlockFi further stated that it had a "multi-disciplinary team,"

---

[8] https://web.archive.org/web/20190401041158/https://blockfi.com/earn-bitcoin-interest/ (last accessed Feb 10, 2023).

[9] https://blockfi.com/in-depth-look-at-blockfis-risk-management (last accessed Feb 9, 2023).

[10] *Id.*

[11] *Id.* (emphasis added)

meeting regularly to "ensure we have sufficient liquidity at all times to meet/exceed client expectations…The framework has helped us ensure all client redemption and withdrawal requests to date have been processed…even during periods of extreme stress in crypto and broader financial markets."[12]

39. Defendant Prince reinforced these falsehoods during a May 2021 appearance on the podcast Modern Finance. During the interview, Prince stated that "[w]e are in the business of risk management at BlockFi." Further downplaying the risk of investing in specifically the BIAs, Prince stated, "[i]n order for any discrete customer at BlockFi to lose money, BlockFi would have to lose all of our money first." "BlockFi's equity is its insurance."[13]

40. As a matter of fact, it was a complete lack of transparency and upholding of these sham risk management policies that resulted in the systemic losses to Plaintiff and Class members. Indeed, it was in large part the over $1.2 billion in loaned assets tied up in FTX and Alameda which lead to its collapse.[14]

41. Prior to its fall in November 2022, BlockFi generated the interest paid out to BIA investors by deploying assets in various ways, including loans of crypto to institutional and corporate borrowers, and by investing in equities and futures. As of December 8, 2021, BlockFi and its affiliates held approximately $10.4 billion in BIA investor assets for approximately 572,160 BIA investors, including 391,105 investors in the United States.

42. At all relevant times, BlockFi represented that it earned interest on the assets borrowed from BIA investors by lending those crypto assets to institutional borrowers.

---

[12] *Id.*
[13] https://modern.finance/episode/block-fi/ (last visited Feb. 9, 2023).
[14] https://financefeeds.com/bitcoin-rally-inflates-blockfis-exposure-to-ftx/

Beginning in September 2020, BlockFi disclosed on its website that it also purchased "SEC-regulated equities and predominantly CFTC-regulated futures using BIA assets."[15]

43. BIA investors were permitted at any time until November 2022 to withdraw the equivalent of the crypto assets held in their BIAs, with some limitations, and could borrow money in U.S. Dollars against the amount of crypto assets deposited in BIAs.

44. BlockFi adjusted the interest rates payable on BIAs for particular crypto assets periodically, typically at the start of each month, providing an opportunity for BIA investors to withdraw all or part of the BIA assets.

45. BlockFi offered and sold the BIA securities to investors, including retail investors, through advertising and general solicitations on its website, www.blockfi.com. BlockFi also promoted distribution of the BIA offering through its social media accounts, including YouTube, Twitter, and Facebook. In addition, through its "partner" program, an affiliate marketing program in which participants could "earn passive income by introducing your audience to financial tools for crypto investors," BlockFi extended its distribution of the BIA securities to retail investors through certain offers and promotions.

46. BlockFi had marketed the BIA accounts as risk free, yielding 6.2 percent interest, more than depositors at banks could get anywhere else. BlockFi's marketing materials and sales agents said BIA depositor investments were safe and redeemable at any time, and investors took them at their word.[16]

---

[15] https://www.sec.gov/litigation/admin/2022/33-11029.pdf
[16] https://web.archive.org/web/20190716140556/https://blockfi.com/crypto-interest-account/ (last accessed Feb 10, 2023).

47. BIA investors poured money into BIAs having been led to believe by BlockFi that BlockFi acted as a bank and that the cryptocurrency industry was a stable financial system. But BlockFi lacked the basic protections offered by a brokerage or a bank.[17]

48. "These companies are all giving the impression of bank like security," said Joshua Fairfield, a professor at Washington & Lee Law School who specializes in technology issues. "These companies want to have customer trust but with none of the responsibility that comes with a regulated financial entity. And that just doesn't work."

49. BIAs were securities and BlockFi offered and sold the BIAs as investment contracts without registering these securities with the SEC for sale to customers, in violation of Section 5 of the Securities Act of 1933.

50. BlockFi offered and sold these securities without a registration statement filed or in effect with the SEC.

51. BlockFi did not have a Securities Act of 1933 registration statement filed or in effect with the SEC for the offer and sale of the BIAs nor did the offer and sale of BIAs qualify for an exemption from registration under the Securities Act.

52. BlockFi regularly promoted the profits investors could earn, and would earn, by investing in BIA and making monthly investment decision to invest in BIAs. When announcing the BIA, BlockFi promoted the interest earned, promising "an industry – leading 6.2 [annual percentage yield]" compounded monthly. BlockFi described it as "an easy way for crypto investors to earn bitcoin as they HODL" – a purposeful misspelling of "hold" and an acronym as "hold on for dear life," denoting buy and hold strategies in the context of crypto assets.

[17] https://www.nytimes.com/2022/12/05/business/cryptocurrency-investors-ftx-blockfi.html (last accessed February 24, 2023).

53. Even when changing the interest rate customers received, BlockFi promoted the yields to investors. On August 27, 2021, BlockFi stated that the adjustments to interest rates are done "with the goal of maintaining great rates for the maximum number of clients."

54. On January 1, 2021, BlockFi advertised that it had "distributed more than $40 million in monthly interest payments to [its] clients."

55. As of November 1, 2021, the interest rates BlockFi paid investors ranged from 0.1% to 9.5% depending on the type of crypto assets and the size of the investment.

56. In July 2021, the New Jersey Bureau of Securities issued a cease-and-desist order, claiming that BlockFi's BIAs were "unregistered securities" and banned BlockFi from creating new BIAs. Shortly thereafter Alabama and Texas issued their own orders, which were followed by Vermont, and Kentucky. Thereafter the SEC opened an investigation which concluded that BlockFi had violated the Securities Act of 1933.

57. In February 2022, BlockFi settled with the SEC for $100 million over the BIAs. It registered with the SEC for new BIA accounts but from mid – February 2022 on, it did not offer the BIAs to new investors in the United States. Existing investors were prevented from adding new money to their BIAs, however they were permitted to continue to accumulate interest in those BIAs and BlockFi continued to announce the month-by-month interest decisions. The existing BIA investors were not provided any information about the registration with the SEC or provided information about the availability of a prospectus or offering statement – neither of which can be located in the files of the SEC. Gary Gensler, Chair of the SEC, is reported to have stated, "[t]oday's settlement makes clear that crypto markets must comply with time-tested securities laws."

58. As part of the settlement with the SEC, BlockFi promised to cease offering BIAs to new investors in the United States and cease accepting further investments or funds in the BIAs by current U.S. investors.

59. BlockFi violated its promises, outlined in the settlement with the SEC, by continuing on a monthly basis to operate the BIA accounts. The accounts did not offer immediate repayments, but instead offered a new monthly interest rate for the purpose and intent of inducing the investors to hold the BIA accounts, not close the accounts, and continue to make new investments through promised receipt of monthly interest. BlockFi did so throughout the class period until its bankruptcy.

60. As part of the settlement with the SEC, BlockFi promised to, within 60 days, comply with Section 7(a) of the Investment Company Act by either: (a) filing a notification of registration pursuant to Section 8(a) of the Investment Company Act and then within 90 days of filing such notification of registration fling a registration statement with the SEC; or (b) completing steps such that BlockFi would no longer be required to be registered under Section 7(a) of the Investment Company Act, all in preparation of a formal public offering on Form S-1 Registration Statement.

61. In fact, BlockFi did none of these things. It arranged for a company called Akura Trust Company ("Akura") to become an indenture trustee (the "Trustee" under an Indenture ("the Indenture") dated April 14, 2022 related to the BIAs registered on the books and records of BlockFi as owned by investors in the United States. Akura was also to advise the BIA investors of this proposed change in their accounts, provide an offering to accept this arrangement, and properly register the offering documents and make the offering pursuant to SEC regulation. Those steps of notification, offer, and supply of offering documents were never done and the

ability of BIA investors to remove their accounts for the accumulated principal and interest was never made.

62. On or about December 9, 2022, BIA account holders were advised for the first time of the existence of Akura and that Akura "intended to file a proof of claim in the bankruptcy case of BlockFi." According to newspaper accounts that proof of claim is for approximately $729 million.[18]

63. Between March 2022 and June 2022, BlockFi's valuation sank by two-thirds to $1 billion. At the end of June 2022, BlockFi reported it held $1.8 billion in open loans and $600 million of exposure.

64. During the summer of 2022, several of BlockFi's major debtors filed for bankruptcy including Three Arrows, Voyager Digital, and Celsius Network.

65. On September 8, 2022, it was announced that three senior executives of BlockFi had resigned including Defendants David Olsson, Global Head of Institutional Distribution, and Samia Bayou, Global Head of Private Client Investors, as well as Shane O'Callaghan, Senior Director of Institutional Sales for Europe, Middle East, and Africa.

66. Although BlockFi's largest debtors, FTX and Alameda, owed it close to $1 billion, instead of insisting on repayments, which neither FTX nor Alameda could do as BlockFi well knew, it accepted a $400 million dollar line of credit from FTX US (of which it drew down $275 million) with the option for FTX US to purchase BlockFi for $25 million then in August 2022 for $15 million, thus disguising its exposure and interconnectedness to FTX and its affiliated companies, including Alameda, and their principles, if certain conditions were not

[18] Kevin Simauchi and Hannah Miller, *Crypto Lender BlockFi Goes Bankrupt in Aftermath of FTX Meltdown*, TIME, Nov. 28, 2022. Available at https://time.com/6237142/blockfi-bankruptcy-ftx/.

satisfied, such as receiving SEC clearance to operate its BIAs in the United States, which it had never received.

67. At the time of these arrangements with FTX and Alameda, some of BlockFi's creditors had sizable positions of ownership with FTX and/or Alameda including Winklevoss Capital, and Galaxy Digital who together were owned $976.8 million by FTX.

68. Moreover, the Winklevosses were not only major creditors and owners of BlockFi, through the sizeable investments their investment arm, Winklevoss Capital, made in four rounds of venture fundraising BlockFi had offered from 2019 through 2020, as stated above, they were also owners and controllers of Gemini Trust Company, BlockFi's custodian for its BIAs, and owner and issuer of Gemini Dollar its preferred stablecoin. In essence, not only was BlockFi exposed to FTX, but due to the intertwined nature of its relationship, BlockFi was also exposed to Gemini.

69. Additionally, among BlockFi's financial investors was Morgan Creek Digital which invested $50 million in BlockFi in a Series C round of financing. In September 2022 Morgan Creek tried to raise $250 million to purchase a majority stake in BlockFi. Morgan Creek's plan to rapidly assemble an equity offer was hatched in response to crypto exchange FTX's announcement that it would extend a $250 million credit line to BlockFi. The FTX credit line proposal had a catch for BlockFi's existing shareholders: it gave FTX the option to buy BlockFi "at essentially zero price."[19] If FTX were to exercise this option, it would effectively wipe out all of BlockFi's existing equity shareholders, including management and employees with stock options, as well as all equity investors in the company's previous venture rounds.

[19] Tracy Wang, *Morgan Creek is Trying to Counter FTX's BlockFi Bailout, Leaked Call Shows*, Jun. 25, 2022 ( available at https://www.coindesk.com/business/2022/06/25/morgan-creek-is-trying-to-counter-ftxs-blockfi-bailout-leaked-call-shows/).

70. In November 2022, FTX, Alameda and its affiliates collapsed and filed for bankruptcy followed shortly thereafter by BlockFi, which in the FTX/Alameda bankruptcy proceedings claims to be owed approximately $1 billion, much of it investor money in the BIAs.

71. On November 8, 2022 before halting trading, Defendant Marquez misrepresented to customers BlockFi's exposure to FTX and BlockFi's ability to operate as normal. Moreover, Defendant Marquez misled Plaintiff and Class members that the money they had in their BIAs was not at risk:




72. On November 11, 2022, a few days after FTX collapsed, BlockFi advised its customers that they could not withdraw their deposits because BlockFi had "significant exposure" to FTX, including funds BlockFi had hoped to draw on under its agreement with FTX and other assets held on the FTX platform.

73. On November 11, 2022, California's Department of Financial Protection and Innovation revoked BlockFi's lending license.[20]

74. On November 14, 2022, BlockFi downplayed its exposure to FTX, lulling its customers into a false sense of security. BlockFi told its customers that despite its exposure to FTX "had the necessary liquidity to explore all options."[21] When in reality the exposure to FTX was much greater than it was disclosing to customers.

75. On November 28, 2022, BlockFi filed for protection under Chapter 11 of the U.S. Bankruptcy Code, citing its exposure to FTX as the reason for its insolvency.

76. On November 28, 2022, BlockFi Inc. and 8 affiliated debtors (collectively, the "Debtors") each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (Trenton). The cases are pending before the Honorable Michael B. Kaplan, and the Debtors have requested that their cases be jointly administered under Case No. 22-19361. In its first-day filing, BlockFi indicated that it had somewhere between $1 billion and $10 billion in total assets, as well as between $1 billion and $10 billion in liabilities. The lender has greater than 100,000 creditors, and about $257 million in cash on hand, some of which it generated by liquidating crypto holdings.

77. BlockFi has about $355 million in cryptocurrencies currently frozen on the crypto exchange according to a statement made by FTX, attorney Joshua Sussberg to the U.S. Bankruptcy Court on Tuesday, December 13, 2022. The $355 million is on top of another $671

[20] https://dfpi.ca.gov/2022/12/19/dfpi-moves-to-revoke-blockfis-ca-financing-law-license/
[21] https://cointelegraph.com/news/blockfi-denies-rumors-that-majority-of-its-assets-were-held-on-ftx (last visited Feb 9, 20203).

million in loan to FTX sister company Alameda Research. Alameda has defaulted on the loan as well.

**FALSE AND MISLEADING STATEMENTS BY BLOCKFI AND DEFENDANTS**

78. BlockFi and Defendants made materially false and misleading statements on its website starting from March 4, 2019, concerning its collateral practices, and therefore, the risks associated with its lending activity. In fact, these collateral practices and those risks were never modified despites changes in representations.

79. Commencing not later than March 4, 2019, BlockFi operated as an unregistered investment company because of its issuance of BIAs and until its bankruptcy it was an issuer of securities, engaged in the business of investing, reinvesting, owning, holding, or trading in securities and owning investment securities having a value exceeding 40% of its total assets.

**BlockFi and Defendants Misrepresented the Level of Risk in BIA Investments**

80. BlockFi and Defendants made material misrepresentations to BIA investors concerning the level of risk in its loan portfolio. Beginning at the time of the BIA launch on March 4, 2019 and continuing to its bankruptcy filing on November 28, 2022, BlockFi and Defendants made statements in multiple website posts that its institutional loans were "typically" over-collateralized, when in fact, most institutional loans were not. As a result, BlockFi's statement materially overstated the degree to which it secured protection from defaults by institutional borrowers through collateral.

81. Although BlockFi and Defendants made other disclosures on its website regarding BlockFi's risk management practices, because of the misrepresentation and omission about the level of risk in its loan portfolio, BIA investors did not have complete and accurate information with which to evaluate the risk that, in the event of defaults by its institutional borrowers,

BlockFi would be unable to comply with its obligation to pay BIA investors the stated interest rates or return the loaned crypto assets to investors upon demand.

**BlockFi Operated as an Unregistered Investment Company**

82. As the issuer of the BIA, BlockFi is an "issuer" for purposes of the Investment Company Act.

83. After the launch of the BIA, BlockFi pooled the crypto assets it borrowed, and commingled and rehypothecated these crypto assets received from investors in the BIAs with BlockFi's other assets, including collateral received from institutional borrowers. As BlockFi took ownership of the loaned crypto assets from investors in the BIAs, BlockFi used the commingled assets to, among other things, make loans to institutional and retail borrowers, stake crypto assets, and purchase crypto asset trust shares and interests in private funds.

84. From at least December 31, 2019 to at least September 30, 2021, BlockFi owned certain investment securities, as defined by Section 3(a)(2) of the Investment Company Act—such as loans of crypto assets and U.S. dollars to counter parties, investments in crypto asset trusts and funds, and intercompany receivables—exceeding 40% of the value of its total assets (exclusive of Government securities and cash items) on an unconsolidated basis. For example, as of December 31, 2020, BlockFi held loans to counter parties valued at over $1.9 billion, investments in crypto asset trusts and funds valued at approximately $1.5 billion, and intercompany receivables valued at approximately $847 million, which together constituted well over 40% of its approximately $4.8 billion in total assets.

85. As an issuer holding over 40% of the value of its total assets in investment securities from at least December 31, 2019 on, BlockFi was an investment company.

86. Although BlockFi was an "investment company," it did not register with the SEC as an investment company, meet any statutory exemptions or exclusions from the definition of an investment company, or seek an order from the SEC declaring that it was primarily engaged in a business other than that of investing, reinvesting, owning, holding, or trading in securities, or exempting it from complying with any provisions of the Investment Company Act or the rules thereunder.

**Failures to Comply With the Disclosure Requirements of the Securities Act of 1933 With Respect to the Issuances of the BIAs.**

87. BlockFi BIAs were an investment, specifically a way for investors to earn a consistent return on crypto assets and to "build their wealth."

88. BlockFi did not have a registration statement filed or in effect with the SEC for the offers and sales of BIAs, nor did it qualify for an exemption from registration under the Securities Act for those offers and sales.

89. As a consequence, BIAs were issued without compliance with the law and the investors lacked the protections that the Investment Company Act would have supplied.

90. From March 2019 through August 2021, BlockFi and Defendants misrepresented on the BlockFi website that its institutional loans were "typically" over-collateralized. In fact, most institutional loans were not.

91. Furthermore, BlockFi and Defendants, throughout the Class Period, misrepresented risk management practices. These included BlockFi's relationship with FTX and its affiliates, the concentration of its loans to FTX, and the inability of FTX to repay those loans when due. Indeed, when the crypto currency market fell two-thirds during 2022, BlockFi announced an arrangement of a line of credit with FTX and a provision that FTX could buy

BlockFi for as little as $25 million at a time that BlockFi had loaned to FTX BIAs and other customer cryptocurrencies worth approximately $1 billion. Investors in BIAs did not have complete and accurate information with which to evaluate the risk that, in the event of defaults by BlockFi's institutional borrowers, BlockFi would be unable to comply with its obligation to pay BIA investors the stated interest rates or return the loaned crypto assets to investors upon demand. This false and misleading statement was in the offer and sale of BIAs, and as such was in the offer and sale of deployment of the loaned assets, the BIA investors' fortunes were also linked to those of the promoter, *i.e.*, BlockFi.

92. Indeed, BlockFi and Defendants had joined a scheme to conceal from the investors of BlockFi the instability of FTX, its financial weaknesses, and its inability to repay BlockFi the loans it made to FTX and its affiliates. Only after FTX filed for bankruptcy protection was the extent of BlockFi's exposure to FTX and its affiliates as well as the lack of necessity for the loan/buyout arrangements made known by BlockFi and FTX in the fall of 2022.

93. BlockFi and Defendants knew these facts from the due diligence it claimed to carry out as part of its investment protocol or was reckless in not knowing because of the lack of applicable and expected bookkeeping and other financial records at FTX and Alameda.

## CLASS ALLEGATIONS

94. Plaintiff Elas brings this action individually and on behalf of the following Class consisting of all persons in the United States who purchased or enrolled in a BIA issued by BlockFi or one of its corporate affiliates from March 4, 2019, the date that BlockFi first issued and sold BIA to U.S. investors, to and including November 28, 2022, the date that BlockFi filed for bankruptcy protection. Excluded from the Class are: the Defendants to this action, corporate officers, members of the boards of directors, and senior executives of BlockFi and its affiliates;

members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants and/or BlockFi and any of its affiliates have or had a financial interest such that they or any of them could influence its operations (the "Class").

95. Plaintiff Elas also brings this action individually and on behalf of the following Class consisting of all persons in Massachusetts who purchased or enrolled in a BIA issued by BlockFi or one of its corporate affiliates from March 4, 2019, the date that BlockFi first issued and sold BIA to U.S. investors, to and including November 28, 2022, the date that BlockFi filed for bankruptcy protection. Excluded from the Class are: the Defendants to this action, corporate officers, members of the boards of directors, and senior executives of BlockFi and its affiliates; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants and/or BlockFi and any of its affiliates have or had a financial interest such that they or any of them could influence its operations (the "Massachusetts Subclass").

96. **Numerosity.** The members of the Class include approximately 300,000 individual investors who live throughout the United States. Joinder of each member of the Class is impracticable and their individual identities including addresses, contact information and investment interests in BIAs is among the records of the bankrupt entities of BlockFi and its affiliates. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of BlockFi and its affiliates.

97. **Existence and predominance of common questions of law and fact.** Common questions of law and fact exist as to all members of the Class and these common questions can be proved efficiently though a single proceeding and predominate over any questions affecting only individual Class members.

98. These common legal and factual questions include, but are not limited to, the following:

a) whether the BIAs were securities required to be registered securities pursuant to the Securities Act of 1933;

b) whether the offerings and sales of BIAs violated the registration provisions of the Securities Act;

c) whether BIAs were offered by BlockFi for sale to investors on a month-to-month basis with investors being given the opportunity to accept or not to accept the investment offered and if not accepted received back the principal plus accumulated interest indicated for their BIA accounts at BlockFi;

d) whether Defendants were controlling persons of BlockFi and responsible for the decision not to register the BIAs or to provide proper offering information such as a prospectus and/or other offering document filed with the SEC;

e) whether Defendants were controlling persons of BlockFi and responsible for the information provided to potential investors in BIAs on a month to month basis and were further responsible for and acted with recklessness or knowledge of the misrepresentations and misstatements described there in violation of the Securities Act and the Securities Exchange Act of 1934;

f) whether Defendants are liable to Plaintiff and the Class, for the violations of the federal securities laws alleged herein; and

g) The type and measure of damages suffered by Plaintiffs and the Class.

99. **Typicality**. Plaintiff's claims are typical of the claims of the other members of the Class in that, among other things, each Class member is similarly situated and are comparably injured through wrongful conduct alleged herein by one or more of the defendants as alleged herein.

100. **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel that are experienced in national and complex securities class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class. Furthermore, Plaintiff has no interests that are antagonistic to those of the Class or Subclasses.

101. **Superiority**. A class action is superior to other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by Class members are relatively small compared to the burden and expense of individual litigation of their claims against Defendants. It would, thus, be economically unfeasible for any member of the Class to bring these claims on an individual basis and to obtain effective redress for the wrongs committed against them particularly as both BlockFi and its affiliates and FTX and its affiliates are in bankruptcy. Furthermore, the court system could not efficiently deal with the 300,000 individual lawsuits filed nationally which in any event could create inconsistent rulings and judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.

## COUNT ONE[22]
## Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder

[22] Pursuant to Mass. G. L. Ch. 93A, Plaintiff sent a written demand letter to Defendants on the date of the filing of this Complaint. Should the good faith negotiations resulting from that letter be unsuccessful, Plaintiff reserves the right to amend the complaint to add a claim under 93A.

102. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 102 as if fully set forth herein.

103. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and did: (i) deceive the investing public, including Plaintiff and the members of the Class, as alleged herein; and (ii) caused Plaintiff and the other members of the Class to purchase BIAs on a month to month basis, without fully disclosing the risks of the investment including the operations and procedures of BlockFi and the concentration of BlockFi's loans with FTX, for which it allegedly did sufficient due diligence and a bank lending tens of millions of dollars. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

104. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the BIAs in an effort to have funds to lend and in a unsafe and concentrated matter to FTX and its affiliates, primarily Alameda in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

105. Each Defendant is sued either as a primary participant in the wrongful and illegal conduct alleged herein or as a controlling person of BlockFi and its affiliates, also as alleged below.

106. Defendants, individually and in concert, directly or indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the BIAs. These Defendants employed devices, schemes and artifices to defraud while in possession of material

adverse non-public information and engaged in acts, practices, and a course of conduct alleged herein including the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of BIAs securities during the Class Period.

107. Defendants misrepresented and failed to disclose it utter failure to comply with the law of the United States including the federal securities laws under the Securities Act; the Securities Exchange Act and the Investment Company Act; that was in the business of selling securities to raise money to lend to other institutions; that it was a bank and not an Investment Company; that its securities were unregistered; and that it had not provided the Plaintiff and Class members with the appropriate information required by the federal securities laws prior to offering and accepting the BIA monthly investments.

108. Defendants misrepresented and failed to disclose BlockFi’s failure to register the BIA securities under the Securities Act of 1933 and/or the Trust Indenture Act and failed to provide the potential investors prior to any acceptance of their monthly offerings appropriate prospectuses or other offering documents filed with the SEC.

109. Defendants attempted to place all BIAs by United States investors in a Trust under the Trust Indenture Act and limit or eliminate rights that BIA investors had for direct actions against BlockFi and Defendants for its failure to prudently invest BIA money.

110. Defendants failed to disclose any information about the concentration of its crypto Counterparties including that it had concentrated its investing with FTX and Alameda of approximately $729 Million or more and could not redeem those investments. Instead

Defendants represented that BlockFi was required to borrow from FTX (that owed it three quarters of a billion dollars or more of BIA money) with an option of FTX to buy BlockFi at less than 4% of what was owed by FTX and Alameda. Neither Plaintiff nor Class members had any way to know that BlockFi was working with undercapitalized borrowers and, in fact, had joined with FTX as a single entity to extract funds from US investors to support FTX, Alameda, and other uncapitalized borrowers such as Celsius, and Three Arrow Capital.

111. Defendants failed to disclose BlockFi's relationship with FTX or that in agreeing to extend not less than $729 million in credit to FTX and Alameda, BlockFi had not conducted at a minimum a credit analysis or due diligence or if it had done so, it would have found the lack of records, and basis documents required of any business such as FTX and Alameda and that hundreds of millions of dollars of FTX and Alameda invested funds were being diverted to the personal use and for political and charitable contributions some of which were controlled by Mr. Bankman-Fried's father.

112. Defendants failed to disclose that Winklevoss Capital, a major investor/owner of BlockFi (in the amount of $1.9 billion) was also a major owner of GTC, BlockFi's custodian. GTC is also in the business of lending crypto assets to third parties for fees. Accordingly, GTC had an interest in maximizing its rate of return at the expense of BlockFi investors.

113. Defendants failed to disclose the intertwined nature of the crypto lending business with risky and thinly capitalized third parties through rehypothecation – using borrowers' collateral to borrow more money/crypto from other lenders. BlockFi CEO and Defendant Prince admitted in July 2022 that BlockFi was negatively impacted by the troubles at Celsius and Three Arrows Capital.

114. Defendants failed to disclose that BlockFi's lending practices profoundly affected BlockFi's solvency because the "collateral" touted by defendants as a foundation of BlockFi's stability and security was illusory and profoundly threatened its solvency.

115. Defendants failed to disclose that BlockFi had a $1 billion loan out to Three Arrows Capital for which BlockFi reportedly held collateral that was likely rehypothecated by BlockFi.[23]

116. Defendants misrepresented BlockFi's business claiming it to be a "bank" and a "market intermediary" which exempted it from the SEC registration requests.

117. Defendants represented that its loans were "typically" over collateralized when in fact most large institutional loans which presented liquidity and concentration of risk damages to BlockFi of its larger institutional loans, such as to FTX and Alameda were not sufficiently collateralized let alone over collateralized. These misrepresentations deprived "complete and accurate information with which to evaluate the risk" to class members investments if BlockFi institutional borrowers defaulted.

118. Defendants' statements about collateralization were also materially false and misleading for implying that risks of investing in BlockFi were minimal because of its reported "over-collateralization" which was false in itself and further failed to disclose that BlockFi was exposed to additional material risk though its broad range of yield generating activities in addition to borrowing and lending crypto assets and its rehypothecation activity.

[23] While BlockFi later reported that the Three Arrows loan was over-collateralized by 30%, it appeared still later that two thirds of that collateral (approximately $1 billion) was cryptocurrency of indeterminate origin. The other third of the collateral was shares of Grayscale Bitcoin Trust ("GBTC") itself a crypto investment product. When BlockFi attempted to liquidate its GBTC collateral the price plunged. Despite the so-called "over-collateralization" of the Three Arrows loans, BlockFi CEO announced that BlockFi lost $80,000,000 when it liquidated the Three Arrows' collateral.

119. Defendants' public representations about investors' ability to demand monies back and/or sell the cryptocurrency were also false.

120. Defendants' primary and controlling personal liability arises from the following facts: (i) Defendants through any stock ownership, were privy to and participated in the creation, development, and sales of BIAs and (ii) each of these Defendants knew, was aware of, or recklessly disregarded BlockFi's dissemination of information to the class that was misleading false or misleading.

121. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in failing to ascertain and disclose such facts, even though these facts were readily available to them. Defendants' material misrepresentations and/or omission were done knowingly or recklessly. Defendants' materially false and misleading statements and omissions clearly demonstrate that, if they did not have actual knowledge of the misrepresentations and omission alleged, they were reckless in failing to obtain such knowledge and deliberately refrained from taking the steps necessary to determine whether those statements were false or misleading.

122. Had Plaintiff and the members of the Class known the truth regarding BlockFi, Plaintiff and the Class would not have invested in the BIAs and or would have not continued to invest on a monthly basis but would have insisted on the repayment of all principal and interest.

123. Plaintiff and the members of the Class were unaware of the falsity of such material misrepresentations and omissions and relied upon them when investing.

124. Plaintiff and the members of the Class were induced to purchase, hold, and refrain from liquidating their securities in reliance on Defendants' material misrepresentations and

omissions. As a direct and proximate result of their reliance on Defendants' misstatements and/or omissions, Plaintiff and the members of the Class suffered damages.

125. As a result of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

126. Plaintiff and the members of the Class are entitled to damages and/or recission, statutory interest, costs and attorneys' fees, less any income received on said securities.

**COUNT TWO**
**Violations of Section 12(a)(2) of the Securities Act of 1933**

127. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 127 as if fully set forth herein.

128. This Claim is brought pursuant to Sections 12(a)(2) of the Securities Act, on behalf of Plaintiff and the Class against all Defendants. This Claim for Relief is not premised upon any allegation of conspiracy, fraud, or intentional or reckless conduct.

129. BlockFi and its affiliates were at all times during the class period "sellers" for purposes 12(a)(2) of the Securities Act.

130. Defendants had direct and active participation in the solicitation of Plaintiff's and Class members' purchases and communicated directly with Plaintiff and the Class through the advertisements and materials published by BlockFi for their and BlockFi's own financial interest and are also "statutory sellers" under Section 12(a)(2).

131. Plaintiff and the other members of the Class acquired BIAs solicited and sold pursuant to written materials which were materially false and misleading.

132. Defendants owed to acquirers of BlockFi's securities, including Plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements

contained in solicitation and sales materials and related documents to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact.

133. Plaintiff and the other members of the Class acquired BIAs securities solicited by and pursuant to the advertisements and other solicitation materials described herein and neither Plaintiff nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies, and omissions contained in those offering documents.

134. By virtue of these violations, Plaintiff and the other members of the Class have sustained damages and/or are entitled to rescission and/or rescissory damages or out of pocket losses.

135. Less than one year has elapsed from the time that Plaintiff discovered the full extent of the facts alleged in this complaint to the time that Plaintiff filed the Complaint. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this Complaint.

136. Section 12(a)(1) grants Plaintiff a private right of action against any person who offers or sells a security in violation of Section 5, and states that such person,

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

137. The acts of Defendants violated Section 5 of the Securities Act as further described herein. Accordingly, Defendants are liable to Plaintiff and members of the Class under Section 12(a)(1) for damages, disgorgement of ill-gotten gains, and/or recission.

**COUNT THREE**
**Unregistered Offer and Sale of Securities in Violation of Sections 5 of the Securities Act of 1933**

138. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1through 138 of this complaint as if set forth in full herein.

139. Plaintiff brings this claim individually and on behalf of the members of the Class against all Defendants.

140. Defendants made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

141. The BIAs are securities within the meaning of Section 2(a)(1) of the Securities Act, Plaintiff and members of the Class purchased BIAs securities through BlockFi and pursuant to an unregistered solicitation by BlockFi and without being offered a prospectus or offering documents registered with the SEC.

142. BlockFi was required to register BIAs, as securities, with the SEC and to provide Plaintiff and the Class with a prospectus or other proper sales documents before offering the securities for sale.

143. There was never any registration of the BIAs under the Securities Act, no prospectus or other registered selling documents were provided to the investors in BIAs and, as alleged above, the written materials contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein as more fully set forth in the first claim for relief and within the factual allegations of this Complaint.

144. By selling unregistered BIAs to Plaintiff and Class members, Defendants violated the Securities Act and are liable for recessionary damages consisting of all deposits including interest left in the BIAs.

145. As a direct and proximate result of Defendants' sale of BIA securities, Plaintiff and members of the Class suffered damages and/or are entitled to rescission and/or rescissory damages or out of pocket losses and/or equitable relief as appropriate.

**COUNT FOUR**
**Violations of Section 15 of the Securities Act of 1933 (Control Person Liability)**

146. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1through 146 of this complaint as if set forth in full herein.

147. Plaintiff brings this claim individually and on behalf of the members of the Class against all Defendants.

148. Under Section 15 of the Securities Act:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

149. Defendants, by virtue of their respective office, stock ownership, and/or agreements or understanding, during the Class Period, has the power and authority to direct the management and activities of BlockFi and its employees and to cause BlockFi to engage in the wrongful conduct detailed herein.

150. Defendants, separately or together, had the power to direct or cause the direction of the management and policies of BlockFi and did so during the Class Period, specifically with respect to the BIA program.

151. Defendants jointly participated in, and/or aided and abetted, BlockFi's sale and solicitation of securities, including BIAs, in violation Section 5 and 12(a)(1) of the Securities Act.

152. The Defendants, separately or together, jointly participated in BlockFi's failure to register BIAs and submit registration statements.

153. As a result of the Defendants' conduct, they are liable to Plaintiff and the members of the Class for damages, disgorgement of ill-gotten gains, and/or recission, as well as costs, attorneys' fees, and interest.

## COUNT FIVE
## Violations of Section 20 of the Securities Exchange Act of 1934 (Control Person Liability)

154. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 154 of this complaint as if set forth in full herein.

155. Plaintiff brings this claim individually and on behalf of the members of the Class against all Defendants.

156. Defendants, by virtue of their office, stock ownership, and/or agreements or understandings, during the Class Period, had the power and authority to direct the management and activities of BlockFi and its employees and to cause BlockFi to engage in the wrongful conduct detailed herein, and did so during the relevant time period with the BIA program.

157. Defendants, separately or together, had the power to direct or cause the direction of the management and policies of BlockFi and did so during the relevant time period with the BIA program.

158. Defendants had sufficient control or influence to have caused BlockFi to make the actionable misrepresentations and omissions discussed herein and in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

159. Defendants had sufficient control or influence to have caused BlockFi to register as an exchange and broker-dealer and refrain from effecting the transactions of securities as an unregistered exchange and unregistered broker-dealer in violation of Sections 5 and 15 of the Exchange Act.

160. As a result of Defendants' conduct, they are liable to Plaintiff and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

**COUNT SIX**
**Violations of G.L. c. 110A § 410(a) and (b)**

161. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 161 of this complaint as if set forth in full herein.

162. Plaintiff brings this claim individually and on behalf of the members of the Massachusetts Subclass against all Defendants

163. Plaintiff's and the members of the Massachusetts Subclass' investments in the BIAs constituted "securities" as defined by G.L. c.110A § 401.

164. In violation of G.L. c. 110A, § 410(a)(1), Defendants offered to sell, sold, and materially aided in the sale of those securities of BlockFi in Massachusetts to Plaintiff and the members of the Massachusetts Subclass in violation of section 301 because (1) the BIAs were not registered under this chapter; (2) the BIAs were not exempt from registration under section 402; and (3) the BIAs were not a federally covered security.

165. In the course of selling those securities to Plaintiff and the members of the Massachusetts Subclass, Defendants and BlockFi made factual misrepresentations and omitted

relevant, material facts, in violation of G.L. c. 110A, § 410(a)(2), which makes it unlawful to offer or sell a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission.

166. Such material misrepresentations and omissions in BIA's offering materials included, but are not limited to:

a) Defendants and BlockFi misrepresented and failed to disclose its utter failure to comply with the law of the United States including the federal securities laws under the Securities Act; the Securities Exchange Act and the Investment Company Act; that it was in the business of selling securities to raise money to lend to other institutions; that it was a bank and not an Investment Company; that its securities were unregistered and that it had not provided the Plaintiff and Class members with the appropriate information required by the federal securities laws prior to offering and accepting the BIA monthly investments.

b) Defendants and BlockFi misrepresented and failed to disclose BlockFi's failure to register the BIA securities under the Securities Act of 1933 and/or the Trust Indenture Act and failed to provide the potential investors prior to any acceptance of their monthly offerings appropriate prospectuses or other offering documents filed with the SEC;

c) Defendants and BlockFi failed to disclose any information about the concentration of its crypto Counterparties including that it had

concentrated its investing with FTX and Alameda of approximately $729 Million or more and could not redeem those investments. Instead, Defendants represented that BlockFi was required to borrow from FTX (that owed it three quarters of a billion dollars or more of BIA money) with an option of FTX to buy BlockFi at less than 4% of what is was owed by FTX and Alameda. Neither Plaintiff nor Class members had any way to know that BlockFi was working with undercapitalized borrowers and, in fact, had joined with FTX as a single entity to extract funds from U.S. investors to support FTX, Alameda, and other uncapitalized borrowers such as Celsius, and Three Arrow Capital.

d) Defendants and BlockFi failed to disclose BlockFi's relationship with FTX or that in agreeing to extend not less than $729 million in credit to FTX and Alameda BlockFi had not at a minimum done a credit analysis or due diligence or if it had done so, it would have found the lack of records, and basis documents required of any business such as FTX and Alameda and that hundreds of millions of dollars of FTX and Alameda invested funds were being diverted to the personal use and for political and charitable contributions some of which were controlled by Mr. Bankman-Fried's father.

e) Defendants and BlockFi failed to disclose that Winklevoss Capital, a major investor/owner of BlockFi (in the amount of $1.9 billion) was also a major owner of GTC, BlockFi's custodian. GTC is also in the business of lending crypto assets to third parties for fees. Accordingly, GTC had an

interest in maximizing its rate of return at the expense of BlockFi investors.

f) Defendants and BlockFi failed to disclose the intertwined nature of the crypto lending business with risky and thinly capitalized third parties through rehypothecation – using borrowers' collateral to borrow more money/crypto from other lenders. BlockFi CEO and BlockFi Individual Defendant Prince admitted in July 2022, that BlockFi was negatively impacted by the troubles at Celsius and Three Arrows Capital.

g) Defendants and BlockFi failed to disclose that BlockFi's lending practices profoundly affected BlockFi's solvency because the "collateral" touted by defendants as a foundation of BlockFi's stability and security was illusory and profoundly threatened its solvency.

h) Defendants and BlockFi failed to disclose that BlockFi had a $1 billion loan out to Three Arrows Capital for which BlockFi reportedly held collateral that was likely rehypothecated by BlockFi.

i) Defendants and BlockFi misrepresented BlockFi's business claiming it to be a "bank" and a "market intermediary" which exempted it from the SEC registration requests.

j) Defendants and BlockFi represented that its loans were "typically" over collateralized when in fact most large institutional loans which presented liquidity and concentration of risk damages to BlockFi, such as to FTX and Alameda were not sufficiently collateralized let alone over collateralized. These misrepresentations deprived investors of "complete

and accurate information with which to evaluate the risk" to class members investments if BlockFi institutional borrowers defaulted.

k) Defendants' and BlockFi's statements about collateralization were also materially false and misleading for implying that risks of investing in BlockFi were minimal because of its reported "over-collateralization" which was false in itself and further failed to disclose that BlockFi was exposed to additional material risk though its broad range of yield generating activities in addition to borrowing and lending crypto assets and its rehypothecation activity.

l) Defendants' and BlockFi's public representations about investors' ability to demand monies back and/or sell the cryptocurrency were also false.

167. Plaintiff and the members of the Massachusetts Subclass were unaware of the falsity of such material misrepresentations and omissions and relied upon them when investing.

168. Defendants knew or in the exercise of reasonable care should have known that they and their affiliates had made such material misrepresentations and omissions in the offering materials.

169. Under G.L. c. 110A, §410(b), "Every person who directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the non-seller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable

care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

170. Defendants, who are control persons and employees of BlockFi, materially aided in the sale of BIAs by BlockFi and cannot sustain the burden of proof that they did not know and in the exercise of reasonable care could have known of such misrepresentations and omissions, respectively.

171. Plaintiff and the members of the Massachusetts Subclass were induced to purchase, hold, and refrain from liquidating their securities in reliance on Defendants' material misrepresentations and omissions.

172. As a direct and proximate result of their reliance on Defendants' misstatements and/or omissions, Plaintiff and the members of the Massachusetts Subclass suffered damages.

173. Plaintiff and the members of the Massachusetts Subclass demand recission, statutory interest, costs, and attorneys' fees, less any income received on said securities.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seek judgment as to all counts against Defendants, as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representative of the Plaintiff's attorneys as Class Counsel to represent the Class;

B. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C. For compensatory and statutory damages in amounts to be determined by the Court and/or jury in an amount of not less than $729 million;

D. For disgorgement of all monies unjustly held by Defendants and/or profits unjustly earned;

E. For prejudgment interest on all amounts awarded;

**DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: March 1, 2023

Respectfully submitted,

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

By: _/s/ Stephen J. Teti__________
Gregg M. Fishbein (*pro hac vice* forthcoming)
Stephen J. Teti (BBO #569332)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
gmfishbein@locklaw.com
sjteti@locklaw.com

Daniel E. Gustafson (*pro hac vice* forthcoming)
Daniel C. Hedlund (*pro hac vice* forthcoming)
David A. Goodwin (*pro hac vice* forthcoming)
Noah L. Cozad (*pro hac vice* forthcoming)
**GUSTAFSON GLUEK PLLC**
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dgoodwin@gustafsongluek.com
ncozad@gustafsongluek.com

Scott David Hirsch (*pro hac vice* forthcoming)
**SCOTT HIRSCH LAW GROUP PLLC**
6810 N. State Road 7
Coconut Creek, FL 33073
Tel: (561) 569-7062
scott@scotthirschlawgroup.com

Fred T. Isquith Sr. (*pro hac vice* forthcoming)
Fred T. Isquith, Jr. (*pro hac vice* forthcoming)
**ISQUITH LAW PLLC.**
220 East 80th Street
New York, NY 10075
Tel: (607) 277-6513
isquithlaw@gmail.com

Adam J. Zapala (*pro hac vice* forthcoming)
Gayatri S. Raghunandan (*pro hac vice* forthcoming)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
graghunandan@cpmlegal.com

Alexander E. Barnett (*pro hac vice* forthcoming)
**COTCHETT, PITRE & McCARTHY, LLP**
40 Worth Street
New York, NY 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753
abarnett@cpmlegal.com

Richard Vita (BBO #510260)
**VITA LAW OFFICES, P.C.**
100 State Street, Suite 900
Boston, MA 02109
Tel: (617) 426-6566
rjv@vitalaw.com

*Counsel for Plaintiff*